**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bureau Veritas Technical Assessments LLC, *et al.*, | No. CV-25-02339-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Blake Brosa, *et al.*, | |
| Defendants. | |

At issue are three Motions to Dismiss and supporting memoranda filed separately by Defendant Apex Imaging Services Incorporated (Docs. 21, 22), Defendant Blake Brosa (Docs. 24, 25), and Defendant Todd Tankersley (Docs. 27, 28). The Court finds this matter appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court will grant Defendant Apex's Motion to Dismiss, deny Defendant Tankersley's Motion to Dismiss, and grant in part and deny in part Defendant Brosa's Motion to Dismiss.

## I.    BACKGROUND

Plaintiffs Bureau Veritas Technical Assessments, LLC ("BVTA") and Bureau Veritas North America, Inc. ("BVNA") provide project management services, building assessment, and code compliance for multi-site customers. (Doc. 1, Compl., ¶¶ 24–26.) To generate business with new or existing customers, Plaintiffs submit responses to Requests for Proposals ("RFPs") in a confidential, competitive bidding process. (*Id*. ¶ 27.) According

to Plaintiffs, Defendant Apex is "a new entrant in the project management services industry" and provides services for "multi-site rollouts." (*Id.* ¶ 33.)

Defendant Brosa began working for Plaintiffs in July 2015 as their Senior Vice President of Sales. (*Id.* ¶ 37.) He managed Plaintiffs' national and multinational customer accounts, sold services, and generated business. (*Id.*) In October 2021, Defendant Brosa was promoted to the Executive Vice President of Sales and, in addition to managing customer accounts, led sales and marketing strategy and guided sales team meetings. (*Id.* ¶¶ 37–39.) In this role, Defendant Brosa had direct access to Plaintiffs' product information, customer list, pricing, RFP submissions, product development, strategy and marketing initiatives, and contact with some of Plaintiffs' "Whale" customers. (*Id.* ¶ 40.) As a part of his employment, Defendant Brosa entered a Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Rights Agreement ("Brosa Agreement"). (*Id.* ¶¶ 41–48; Doc. 1-2.) The Brosa Agreement contained four covenants at issue in this matter: (1) confidentiality; (2) non-competition; (3) non-solicitation; and (4) non-recruitment ("Brosa Covenants").

In 2011, Defendant Tankersley was hired by Quality Project Management, LLC ("QPM") as a Project Manager. (Compl. ¶ 49.) QPM was a child company of Plaintiff BVNA and an affiliate company of Plaintiff BVTA. (*Id.* ¶ 50.) As a part of his employment with QPM, Defendant Tankersley entered a confidentiality agreement ("Tankersley Agreement"). (*Id.* ¶¶ 50, 60–65; Doc. 1-1.) According to Plaintiffs, BVTA acquired QPM and received a transfer or assignment of the Tankersley Agreement. (Compl. ¶ 50.) Due to the acquisition, Defendant Tankersley "became a BVTA employee." (*Id.*) In 2019, Defendant Tankersley was promoted to Plaintiffs' Senior Product Developer and developed client-specific project tracking software through an application called "ProTrack." (*Id.* ¶¶ 52–55.)

In November 2024, Defendant Brosa extracted several files from his work computer to a flash drive and sent customer communications and documents to his personal email account. (*Id.* ¶¶ 68–82.) In December 2024, Defendant Brosa terminated his employment

with Plaintiffs and began working for Defendant Apex as its Director of Business Development for Multi-Site Retail. (*Id*. ¶¶ 66–67.) Even after his employment ended, Defendant Brosa retained possession of his former work computer and extracted additional information. (*Id*. ¶¶ 83–84.) On December 23, 2024, Plaintiffs sent Defendants Apex and Brosa a letter that recited portions of the Brosa Covenants. (*Id*. ¶ 85; Doc. 1-3.)

In April 2025, Defendant Tankersley terminated his employment with Plaintiffs and began working for Defendant Apex as its Director of Systems the following month. (Compl. ¶¶ 87–90.) In June 2025, Defendant Brosa sent an airline ticket from his personal email account to Plaintiffs' sales executive to fly from the Ontario airport back to the executive's home city of Phoenix, Arizona. (*Id*. ¶ 92.) The Ontario airport is twenty minutes from Defendant Apex's headquarters. (*Id*.) Sometime after this flight, the executive terminated her employment with Plaintiffs. (*Id*.)

On July 3, 2025, Plaintiffs sued Defendants Apex, Brosa and Tankersley, asserting nine claims: (1) misappropriation of trade secrets under the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, against all Defendants; (2) misappropriation of trade secrets under the Arizona Uniform Trade Secrets Act ("AUTSA"), A.R.S. §§ 44-401–07, against all Defendants; (3) breach of the confidentiality covenant in the Brosa Agreement against Defendant Brosa; (4) breach of the non-solicitation and non-recruitment covenants in the Brosa Agreement against Defendant Brosa; (5) breach of the non-competition covenant in the Brosa Agreement against Defendant Brosa; (6) breach of the confidentiality covenant in the Tankersley Agreement against Defendant Tankersley; (7) breach of the duty of loyalty against Defendant Brosa; (8) tortious interference with a contract or expectancy against Defendant Apex; and (9) unfair competition against all Defendants. (*Id*. ¶¶ 98–216.) Defendants each filed their respective Motions to Dismiss and supporting memoranda (Docs. 21, 22, 24, 25, 27, 28),[1] to which Plaintiffs responded (Docs. 36–38) and Defendants replied (Doc. 48–50).

. . .

---

[1] No Defendant moves to dismiss the seventh claim, so the Court will not address it.

## II.    LEGAL STANDARD

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up and citations omitted). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

. . .

. . .

. . .

1  **III.    ANALYSIS**

2      **A.    Counts One and Two: Misappropriation of Trade Secrets**

3          Plaintiffs bring claims for trade secret misappropriation under both the federal

4  DTSA (Count One) and its state law counterpart AUTSA (Count Two). (Compl. ¶¶ 98–

5  132.) Defendants Apex and Tankersley, but not Defendant Brosa, move to dismiss these

6  claims. (Doc. 22 at 3–7; Doc 28 at 3–9.)

7          District courts have analyzed claims arising under the DTSA and AUTSA together

8  because the elements are identical. *See Early Warning Servs. LLC v. Johnson*, No. CV-24-

9  01587-PHX-SMB, 2025 U.S. Dist. LEXIS 89594, *4 (D. Ariz. May 12, 2025); *ReBath*

10  *LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 U.S. Dist. LEXIS 223194, *2–3

11  (D. Ariz. Sep. 18, 2020). This approach is especially appropriate because Plaintiffs'

12  allegations underlying both claims are the same. (*Compare* Compl. ¶¶ 98–115 *with* ¶¶ 116–

13  32.) For a trade secret misappropriation claim to survive a motion to dismiss, a plaintiff

14  must sufficiently plead: "(1) that the plaintiff possessed a trade secret[;] (2) that the

15  defendant misappropriated the trade secret; and (3) that the misappropriation caused or

16  threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d

17  653, 657–58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)).

18         **1.    *Trade Secrets***

19          First, "plaintiffs must identify the trade secrets . . ." *Id.* at 658 (citation and internal

20  quotation marks omitted). Trade secrets are defined broadly and include three components:

21  "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner

22  has attempted to keep secret." *Id.* at 657; *see also* 8 U.S.C. § 1839(3); A.R.S. § 44-401(4).

23  Even though trade secrets are defined broadly, "[t]he plaintiff should describe the subject

24  matter of the trade secret with sufficient particularity to separate it from matters of general

25  knowledge in the trade or of special knowledge of those persons . . . skilled in the trade."

26  *Inteliclear*, 978 F.3d at 658 (citation and internal quotation marks omitted). "Plaintiffs may

27  not simply rely upon catchall phrases[,] identify categories of trade secrets they intend to

28  pursue at trial . . . [or] cite and incorporate by reference hundreds of documents that

purportedly reference or reflect the trade secret information." *Id.* Identifying a trade secret with particularity is important because it allows a defendant to adequately prepare a rebuttal and for the trier of fact to navigate the "sophisticated and highly complex system[s]" that trade secrets typically create. *Id.*

Defendants Apex and Tankersley argue that Plaintiffs fail to sufficiently identify trade secrets in their Complaint. (Doc. 22 at 3–6; Doc. 28 at 7.) The Complaint broadly describes Plaintiffs' trade secrets to include "confidential and proprietary processes and methods, customer-specific applications, customer pipelines, business plans and strategies, pricing information, customer lists, customer-service factors, financial records, marketing strategies, and plans for maintaining, developing, and growing BVTA's project management business, and compilations of such data and information." (Compl. ¶¶ 100, 118.) According to Defendant Apex, this description of the purported trade secret amounts to Plaintiffs' entire business, contains "business puffery," and is not particular. (Doc. 22 at 3–4.)

Such a broad description, without more, would likely fail to plead the first element of a trade secret misappropriation claim. But the Complaint describes at least one purported trade secret with particularity. Plaintiffs allege that they developed "proprietary and highly confidential client-specific applications on ProTrack," which required considerable time, money and resources. (Compl. ¶¶ 52, 58.) According to Plaintiffs, the trade secret is the customer-specific applications of ProTrack, not ProTrack itself. (*Id.* ¶¶ 53–56.) These applications and the knowledge of how to create them is allegedly unique to Plaintiffs and distinguishes them from other businesses in the industry because "it can be applied across hundreds or thousands of locations across the United States." (*Id.* ¶ 56.) This feature of Plaintiffs' business "is often a determinative factor for customers in deciding which proposal to an RFP is successful." (*Id.*) These customer-specific applications and the knowledge and skill of how to create them "would be of tremendous value to a competitor," including "a new entrant into the market like Apex." (*Id.* ¶ 59.) Taking these facts as true,

1   Plaintiffs sufficiently plead that the client-specific applications of ProTrack constitute

2   information that is valuable because it is not known to others.

3   Defendant Tankersley attacks Plaintiffs' allegations for failing to distinguish the

4   knowledge and skill of creating the software from general skills and knowledge gained in

5   the industry. (Doc. 28 at 6–7.) However, the Complaint alleges that the knowledge and

6   skill to create customer-specific applications were derived from expensive and resource-

7   intensive development efforts. (Compl. ¶¶ 56, 58–59.) Taking these facts as true, this

8   knowledge and skill transcends that which would be "general" in the industry. *See, e.g.*,

9   *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 978 (D. Ariz. 2015) (holding that

10  information derived from years of data development and analysis was not general

11  knowledge).

12  In addition to being information that is valuable for not being known by others, it

13  must also be subject to Plaintiffs' efforts to keep it a secret. Here, Plaintiffs allege that their

14  purported trade secrets are subject to various protections under Plaintiffs' confidentiality

15  agreements executed by employees, Code of Ethics, and password protection for computer

16  systems. (Compl. ¶¶ 36, 61–63.) These efforts are sufficient to identify Plaintiffs'

17  reasonable measures to maintain the secrecy of the software. *See Inteliclear*, 978 F.3d at

18  658 (instituting confidentiality policies that protect purported trade secrets constitute

19  reasonable efforts); *Fire Sec. Elecs. & Commc'ns Inc. v. Nye*, No. CV-23-02730-PHX-

20  DLR, 2024 U.S. Dist. LEXIS 25575, at *9 (D. Ariz. Feb. 13, 2024) (instituting computer

21  passwords constitute reasonable efforts). At this early stage of the proceedings, Plaintiffs

22  sufficiently identify at least one trade secret under the broad definition of the DTSA and

23  AUTSA.

24  **2.**    ***Misappropriation***

25  Second, a plaintiff must sufficiently plead that a defendant misappropriated the trade

26  secret. The term "misappropriation" is defined as:

27

28

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

    (i) used improper means to acquire knowledge of the trade secret;

    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

        (I) derived from or through a person who had used improper means to acquire the trade secret;

        (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    (iii) before a material change of the position of the person, knew or had reason to know that—

        (I) the trade secret was a trade secret; and

        (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C § 1839(5); *see also* A.R.S. § 44-401(2). Improper means includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." 18 U.S.C § 1839(6); A.R.S § 44-401(2).

    While improper means include several kinds of conduct, "[m]ere possession of trade secrets by a departing employee is not sufficient to establish misappropriation or show injury." *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1207 (E.D. Cal.

2020). Rather, the purported misappropriation must extend beyond mere possession. *Id.* at 1207–08 (allegations that the defendant deployed a sales method claimed to be a trade secret were sufficient to plead misappropriation); *Early Warning Servs. LLC*, 2025 LEXIS 89594, at *12–13 (allegations that the defendant published previously unknown information without the plaintiff's consent were sufficient to plead misappropriation); *see e.g.*, *Fire Sec. Elecs. & Commc'ns Inc.*, 2024 U.S. Dist. LEXIS 25575, at *10–11 (evidence of a former employee coordinating with a current employee to copy files supported misappropriation).

Defendants Apex and Tankersley dispute that Plaintiffs sufficiently allege facts giving rise to misappropriation. (Doc. 22 at 6–7; Doc. 28 at 3–8.) Defendant Tankersley specifically argues that Plaintiffs' allegations that he will "inevitably" use or disclose a trade secret are insufficient under the "inevitable disclosure doctrine."[2] (Doc. 28 at 5–8.)

However, Plaintiffs do not merely allege inevitable use or disclosure. Rather, Plaintiffs assert that Defendant Tankersley is *currently* using or disclosing his knowledge of how to create Plaintiffs' proprietary computer software to "develop copies of [Plaintiffs'] customer-specific applications for Apex" without Plaintiffs' permission. (Compl. ¶ 91.) According to Plaintiffs, Defendant Apex did not have a similar computer software prior to Defendant Tankersley's employment. (*Id.* ¶ 57.) Plaintiffs also allege that Defendant Tankersley signed a confidentiality agreement that expressly prohibited the use or disclosure of computer software outside the scope of his employment with Plaintiffs, which supports an inference that Defendant Tankersley owed a duty of secrecy to Plaintiffs. (*Id.* ¶¶ 61–63.) These facts, taken as true and construed in a light most favorable to Plaintiffs, sufficiently allege that Defendant Tankersley misappropriated Plaintiffs' trade

---

[2] This doctrine has not been clearly recognized as a cognizable legal theory under AUTSA in Arizona or under the DTSA in the Ninth Circuit. (Doc. 49 at 2–4.) *See Liss v. Exel Transp. Servs.*, No. CIV-04-2001-PHX-SMM, 2007 U.S. Dist. LEXIS 20555, at *27 (D. Ariz. Mar. 20, 2007) ("It is unclear whether Arizona recognizes the theory of inevitable disclosure as the Court did not locate a single case in Arizona applying this theory."); *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 3:21-cv-01631-HZ, 2022 U.S. Dist. LEXIS 2804, at *19 (D. Or. Jan. 3, 2022) ("DTSA specifically forecloses courts from granting relief based on the inevitable disclosure doctrine . . .").

secret by developing the same software for Defendant Apex while owing a duty to Plaintiffs to maintain the secrecy of the trade secret. *See* 18 U.S.C. § 1839(5)(B).

As for Plaintiffs' claim against Defendant Apex, Plaintiffs' allegations of misappropriation are far less detailed. Plaintiffs advance that Defendant Apex hired Defendants Brosa and Tankersley "to induce them to unlawfully disclose BVTA's confidential and trade secret information." (Compl. ¶ 2.) But nowhere in the Complaint do Plaintiffs allege facts supporting that Defendant Apex knew or had reason to know that Defendants Brosa and Tankersley acquired Plaintiffs' trade secrets by improper means, or that Defendant Apex used improper means to acquire trade secrets itself. *See, e.g.*, *Solar Optimum Inc. v. Elevation Solar LLC*, No. CV-23-00135-PHX-SMB, 2024 U.S. Dist. LEXIS 80983, *14–15 (D. Ariz. May 3, 2024) (allegations that executives of the defendant company directed the plaintiff's former employee to use a current employee's credentials and access trade secret information was sufficient to plead misappropriation); *Early Warning Servs. LLC*, 2025 U.S. Dist. LEXIS 89594 at *11–12 (allegations that a defendant company registered the plaintiff's intellectual property knowing it was procured improperly by the plaintiff's employee was sufficient to plead misappropriation).

The only factual assertions advanced by Plaintiffs appear to be that Defendant Apex received the benefit from Defendants Brosa and Tankersley's misappropriation. For instance, Plaintiffs allege that Defendant "Apex did not have the ability to quickly develop customer-specific applications to scale to meet the demands of BVTA's national and multinational multi-site customers" prior to hiring Defendant Tankersley. (Compl. ¶ 57.) When Defendant Tankersley allegedly joined Defendant Apex as its Director of Systems, he became "responsible for developing Apex's software development, including the development of customer-specific project management applications on the same ProTrack platform utilized by BVTA." (*Id.* ¶ 90.) These allegations are insufficient on their own under DTSA and AUTSA, which requires that Defendant Apex knew or had reason to know that the software was misappropriated. *See Joshua David Mellberg LLC*, 96 F. Supp. 3d at 982–83 (allegations that a competitor business merely benefitted from its employees

using trade secrets in the course of employment is insufficient to allege misappropriation as to the competitor business); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1182 (D. Wash. 2019) ("[M]erely recruiting another company's employees does not meet the knowledge requirement for trade secret misappropriation.") Without sufficiently pleading misappropriation, Counts One and Two fail as alleged against Defendant Apex.

### 3.    *Threatened or Caused Damage*

Finally, a plaintiff must sufficiently plead that the misappropriation caused, or threatened to cause, the plaintiff harm. "Damages are an essential element of . . . [a] misappropriation of trade secret . . . claim[], and a claim fails as a matter of law without a cognizable theory of proximately caused damages." *W.L. Gore & Assocs. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 888 (D. Ariz. 2012) (modifications in original) (citation and internal quotation marks omitted). "The very purpose of trade secret law is to protect valuable confidential information from discovery." *Ctr. for Auto Safety v. Goodyear Tire & Rubber Co.*, 247 Ariz. 567, 573 (Ariz. App. 2019) (citation and internal quotation marks omitted).

Defendant Tankersley argues that Plaintiffs fail to state facts to form a basis for damages. (Doc. 28 at 8.) The Court disagrees. According to Plaintiffs, Defendant Tankersley's misappropriation of the proprietary client-specific software harms Plaintiffs' competitive offering of that software, which "is often a determinative factor for customers" in selecting a company to provide services. (Compl. ¶¶ 57, 91, 93–94; Doc. 38 at 12.) Factual allegations identifying an injury to competitive standing, along with allegations that the software was developed at a substantial cost (Compl. ¶ 58), is sufficient at this stage.

In sum, Plaintiffs sufficiently plead the elements of trade secret misappropriation under the DTSA and AUTSA as to Defendant Tankersley, but not as to Defendant Apex. Accordingly, the Court will dismiss Counts One and Two against Defendant Apex. It is possible that Plaintiffs can cure this pleading defect by amendment with additional, well-

1    pled facts. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). The Court will therefore

2    grant Plaintiffs leave to amend Counts One and Two as to Defendant Apex.

3    **B.    Counts Three through Six: Breach of Contract**

4        Plaintiffs bring three breach of contract claims against Defendants Brosa for

5    violating the Brosa Covenants (Compl. ¶¶ 133–77), and one breach of contract claim

6    against Defendant Tankersley for violating the confidentiality covenant in the Tankersley

7    Agreement (*Id.* ¶¶ 178–94). In asserting a breach of contract claim, a plaintiff must allege

8    sufficient facts that identify (1) a contract, (2) breach, and (3) damages. *Thunderbird*

9    *Metallurgical, Inc. v. Ariz. Testing Lab.*, 423 P.2d 124, 126 (Ariz. 1967).

10        **1.    *Assignment of the Tankersley Agreement***

11        Defendant Tankersley argues that Plaintiffs' breach of contract claim fails because

12    they do not properly allege that a contract exists between Plaintiffs and Defendant

13    Tankersley. (Doc. 28 at 10–11.) Rather, that contract is held between QPM and Defendant

14    Tankersley. (*Id.*) However, Plaintiffs expressly allege that the Tankersley Agreement was

15    transferred or assigned to Plaintiff BVTA after an "acquisition" of QPM. (Compl. ¶¶ 49–

16    50.) Arizona law recognizes transfers or assignments of restrictive covenants to a

17    successive employer, which is the kind of transfer or assignment alleged by Plaintiffs. *See*

18    *Supplies for Indus. v. Christensen*, 659 P.2d 660, 661–62 (Ariz. App. 1983) (holding that

19    restrictive covenants in an employment agreement can be equitably assigned to a

20    successive employer); *see also Sogeti USA LLC v. Scariano*, 606 F. Supp. 2d 1080, 1082

21    (D. Ariz. 2009) (collecting and discussing Arizona case law regarding the assignment of

22    employment agreements) (citations omitted).

23        Defendant Tankersley argues that the Tankersley Agreement could not be

24    transferred or assigned because it lacks an assignment clause and Defendant Tankersley

25    did not consent to the transfer or assignment. (Doc. 28 at 10.) Defendant Tankersley

26    provides no legal authority for this proposition. In fact, district courts have observed the

27    opposite proposition—that "Arizona law is most consistent with the jurisdictions that allow

28    successor companies to enforce restrictive covenants, even when the contract is silent

1    regarding assignability and the employee has not consented." *Sogeti USA LLC*, 606 F.

2    Supp. 2d at 1085. At this early stage, Plaintiffs' allegations are sufficient to identify at least

3    one Plaintiff as a party to the Tankersley Agreement by transfer or assignment.

### 2.    *Enforceability of the Brosa Covenants*

5    Defendant Brosa asserts that Plaintiffs' breach of contract claims fail because the

6    Brosa Covenants are unenforceable. (Doc. 25 at 3–7.) The enforceability of a covenant

7    depends on the reasonableness of the restraint, which "is a fact-intensive inquiry that

8    depends on the totality of the circumstances." *Valley Med. Specialists v. Farber*, 194 Ariz.

9    363, 369 (Ariz. 1999). While fact-intensive, enforceability of a restrictive covenant is

10    ultimately a question of law. *Id.* at 366–67. "The legitimate purpose of post-employment

11    restraints is to prevent competitive use, for a time, of information or relationships which

12    pertain peculiarly to the employer and which the employee acquired in the course of the

13    employment." *Id.* at 367. A restrictive covenant is unreasonable, and therefore

14    unenforceable: "(1) if the restraint is greater than necessary to protect the employer's

15    legitimate interest; or (2) if that interest is outweighed by the hardship to the employee and

16    the likely injury to the public." *Id.* at 369.

### a.    *Confidentiality Covenant*

18    A confidentiality covenant is overly broad if it seeks to protect information that is

19    available to the public. *Orca Communs. Unlimited, Ltd. Liab. Co. v. Noder*, 233 Ariz. 411,

20    417 (Ariz. App. 2013) ("*Orca I*"), *de-published in part on other grounds*, 236 Ariz. 180

21    (Ariz. 2014) ("*Orca II*"). If a confidentiality covenant is overbroad, it is considered a non-

22    compete covenant and must have reasonable temporal and geographical restrictions to be

23    enforceable. *Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510, 517 (Ariz. App. 1986).

24    Arizona's public policy promotes use of and access to information in the public

25    domain. *See Enter. Leasing Co. v. Ehmke*, 197 Ariz. 144, 149 (Ariz. App. 1999). For

26    example, in *Orca I*, the Arizona Court of Appeals held that an employer's confidentiality

27    agreement was overly broad because it dubbed publicly available information as

28    "confidential" based on two qualifications: (1) whether a member of the public would have

difficulty in locating the information; and (2) whether the information was learned through employment. 233 Ariz. at 417. The court reasoned that an employer has "no protectable interest in public information" even if "a member of the public may have to expend substantial time to gather it and comprehend its significance" or the employee learned of the information by virtue of her employment. *Id.*

Here, Defendant Brosa argues that the confidentiality covenant is unenforceable because it includes non-confidential information and lacks temporal and geographic restrictions. (Doc. 25 at 4–5.) Plaintiffs argue that the confidentiality covenant is properly tempered because it restricts only the use of information arising out of Plaintiffs' business and excludes information made available to the public or information Defendant Brosa knew prior to his employment with Plaintiffs. (Doc. 36 at 10–11.)

Plaintiffs overstate the mitigative effect of those exclusions contained in the confidentiality covenant. The covenant states:

> All documents or information, in whatever form or medium, regarding the business or affairs of the Company and its affiliates . . . shall all be deemed 'Confidential Information,' **except to the extent the same shall have been lawfully and without breach of obligation made available to the general public without restriction** . . .

(Doc. 1-2 ¶ 1(a) (emphasis modified).) In other words, Defendant Brosa would be prohibited from using public information if it was made public by someone else in Plaintiffs' employ in a manner that violated that person's obligations to Plaintiffs. The effect of the confidentiality covenants here and in *Orca I* are the same: they prohibit an employee from using information that is freely in the public domain. *See* 233 Ariz. at 417. "Information easily or readily available to the public remains public knowledge and not protectable as confidential information" no matter the manner in which it becomes public. *Id.* For these reasons, Plaintiffs' confidentiality covenant is overbroad. Due to the overbreadth of the confidentiality covenant, it will be construed as a non-competition agreement and must be limited in time and geography. Plaintiffs do not identify, and the

Court cannot find, any temporal or geographic limitation in the confidentiality covenant. It is therefore unreasonable and unenforceable.

Plaintiffs request that the Court sever the unenforceable portions under the severance clause contained in the Brosa Agreement. (Doc. 36 at 16 n.4; Doc. 1-2 ¶ 5.) "Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions." *Valley Med. Specialists*, 194 Ariz. at 372. But "[w]here the severability of the agreement is not evident from the contract itself, the court cannot create a new agreement for the parties to uphold the contract." *Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 533 (Ariz. 1986) ("*Olliver*"). And the blue pencil doctrine cannot be used to create temporal or geographical terms that do not exist. Because the confidentiality covenant is unenforceable on its face and incurable, the Court will dismiss Count Three with prejudice.

### b.    *Non-Compete Covenant*

"A covenant not to compete precludes former employees from working in the same business as the employers for certain time periods in specified areas." *Hilb, Rogal & Hamilton Co. v. McKinney*, 190 Ariz. 213, 216 (Ariz. App. 1997) These covenants "are disfavored and thus are strictly construed against employers." *Id.* To be enforceable, a non-compete covenant should "not exceed that reasonably necessary to protect the employer's business, is not unreasonably restrictive of the rights of the employee, does not contravene public policy, and is reasonable as to time and space." *Bed Mart, Inc. v. Kelley*, 202 Ariz. 370, 372 (Ct. App. 2002) (citation omitted). "An employer has a legitimate interest in preventing competitive use, for a time, of information or relationships which pertain particularly to the employer and which the employee acquired in the course of the employment . . . [and] in having a reasonable amount of time to overcome the former employee's loss . . ." *Id.* (citation and internal quotation marks omitted).

Plaintiffs assert that Defendant Brosa violated the non-compete covenant by working for Defendant Apex, a competitor of Plaintiffs, in a similar role. (Compl. ¶¶ 170–71.) Defendant Brosa argues the non-compete covenant is unenforceable because it

prohibits him "from taking employment with any 'competitor' anywhere in the world." (Doc. 25 at 5.) Plaintiffs argue that the "geographic scope is limited to only activities that jeopardize BVTA's confidential information and goodwill." (Doc. 36 at 16.)

Upon review of the covenant and Plaintiffs' well-pled allegations, however, the covenant restricts more than activities that jeopardize Plaintiffs' business interests in the area that those activities occurred. As Plaintiffs themselves allege, Defendant Brosa broadly managed sales and marketing strategies on a vast national and multi-national scale. (Compl. ¶¶ 37, 39.) In applying the plain language of the covenant to Defendant Brosa's expansive role, it is evident that the covenant effectively prevents Defendant Brosa from pursuing any role that involves sales, marketing or client management nationally and internationally for a business that offers any one of Plaintiffs' many project management services. These restrictions are not merely based on whether Defendant Brosa's role would use confidential information or existing customer relationships, *Bed Mart, Inc.*, 202 Ariz. at 372; rather, they amount to a *per se* restriction on competition. As currently pled, this covenant is overbroad in terms of the restricted activity and unreasonable as to the geographic scope, rendering it unenforceable.

Plaintiffs request that the Court sever the unenforceable parts under the severance clause contained in the Brosa Agreement. (Doc. 36 at 16 n.4; Doc. 1-2 ¶ 5.) Here, striking the geographic scope as written will leave no geographic scope at all, which does not cure the defect that renders the non-compete covenant unreasonable. Accordingly, the Court will dismiss Count Five. It is possible that the defect can be cured by amendment with additional, well-pled facts, so the Court will grant Plaintiffs leave to amend this claim. *Lopez*, 203 F.3d at 1130.

c.    *Non-Solicitation Covenant*

A non-solicitation covenant "is designed to prevent former employees from using information learned during their employment to divert or to 'steal' customers from the former employer." *Olliver*, 148 Ariz. at 531. This type of covenant is "ordinarily not deemed unreasonable or oppressive." *Id.* Still, a non-solicitation covenant must be "no

broader than necessary to protect the employer's legitimate business interest." *Bed Mart, Inc.*, 202 Ariz. at 372. An employer has no legitimate business interest in protecting persons or entities with whom it has no business ties, such as potential or former customers. *Hilb*, 190 Ariz. at 216; *Orca I*, 233 Ariz. at 418.

Defendant Brosa argues the non-solicitation covenant[3] is unenforceable because it is based on an unreasonable one year-long time restriction and improperly prohibits solicitation of prospective clients with whom Plaintiffs have no legitimate interest to protect. (Doc. 25 at 6–7.) Plaintiffs contend that the covenant is reasonable because a one-year time limitation is routinely enforced in Arizona, and it limits solicitation only to those clients with whom Defendant Brosa had a relationship within eighteen months prior to his termination. (Doc. 36 at 13–14.)

Even assuming the reasonableness of a one-year time restriction, the non-solicitation covenant is still unreasonable because it ultimately prohibits solicitation of prospective and former clients with whom Plaintiffs have no legitimate interest to protect. The non-solicitation covenant defines a class of individuals and entities falling within the covenant's protection as follows:

> Employee agrees that during Employee's employment with the Company and for a period of twelve (12) months immediately following the date of Employee's termination from employment for any reason (the "Non-Solicit Restricted Period"), other than in connection with Employee's duties for the Company: . . . Employee shall not directly or indirectly solicit business from or interfere with, or attempt to solicit business from or interfere with, **any actual or prospective customer, service provider, vendor, or supplier of the Company or any affiliate of the Company with whom the Company or any affiliate did business or who the Company or any affiliate solicited within the eighteen (18) months prior to Employee's termination from employment with**

---

[3] The Court assumes the following enforceability argument made by Defendant Brosa pertains only to the non-solicitation covenant of the Brosa Agreement (Doc. 1-2 ¶ 2(b)) and not to the non-recruitment covenant (Doc. 1-2 ¶ 2(c)). The Court reaches this assumption because Defendant Brosa cites paragraph 2(b) in his Motion to Dismiss and Reply thereto, but not once does he cite paragraph 2(c). (Doc. 25 at 6–7; Doc. 50 at 4–5.)

1
2
3
4

**the Company, and (1) who or which Employee contacted, called on, serviced, or did business with, on behalf of the Company or any affiliate of the Company, during Employee's employment with the Company, or (2) about whom Employee received Confidential Information**.

5
6
7
8
9

(Doc. 1-2 ¶ 2(b)(i) (emphasis added).) The plain language of this covenant identifies two qualifications of the protected customer class. First, the customer must have an actual or prospective relationship with Plaintiffs during the eighteen months prior to Defendant Brosa's termination date. Second, the customer must have had contact with Defendant Brosa during his employment.

10
11
12
13
14
15
16
17
18
19
20
21

As Plaintiffs point out, Arizona courts have found that a non-solicitation covenant limited "to only those clients that the employee had relationships with during the period of employment is not unreasonable or oppressive." *Colwell Consulting LLC v. Papageorge*, No. 2:24-cv-01824-JCG, 2024 U.S. Dist. LEXIS 144503, at *16 (D. Ariz. Aug. 14, 2024) (citing *Olliver*, 148 Ariz. at 531–32). However, Arizona Courts have also found that an employer has no legitimate interest in protecting former or potential business relationships. *Hilb*, 190 Ariz. at 216; *Orca I*, 233 Ariz. at 418. Here, the non-solicitation covenant expressly includes prospective customers that were merely "solicited" by Plaintiffs. It also includes customers who "did" business with Plaintiffs within the eighteen months prior to Defendant Brosa's termination. The use of past tense expands the class of customers to include former customers. The inclusion of prospective and former customers is clearly disfavored under Arizona law and is unreasonable.

22
23
24
25
26
27
28

Plaintiffs urge the Court to strike these unreasonable portions under the blue pencil doctrine. (Doc. 36 at 16 n.4; Doc. 1-2 ¶ 5.) If the Court were to sever the offending portions stating "or prospective" and "with whom the Company or any affiliate did business or who the Company or any affiliate solicited within the eighteen (18) months prior to Employee's termination from employment with the Company," the language that remains would prohibit Defendant Brosa from soliciting "any actual customer, service provider, vendor, or supplier of the Company or any affiliate of the Company" within the one-year period

after his termination. This alteration expands the covenant's scope beyond what the parties originally contemplated. What once prohibited solicitation of only those customers that existed in the eighteen months prior to Defendant Brosa's termination would now include customers that formed business ties with Plaintiffs after Defendant Brosa's termination date. Such a significant change amounts to judicial reformation that this Court cannot effect. *See Varsity Gold, Inc. v. Porzio*, 202 Ariz. 355, 358 (Ariz. App. 2002).

Because the non-solicitation covenant is unenforceable on its face and incurable, the Court will dismiss Count Four pertaining only to the non-solicitation covenant[4] with prejudice.

### 3.    *Breach*

The remaining covenants at issue are the non-recruitment covenant in the Brosa Agreement (Count Four), and the confidentiality covenant in the Tankersley Agreement (Count Six). In Count Four, Plaintiffs claim that Defendant Brosa violated the non-recruitment covenant that prohibited Defendant Brosa from actual or attempted solicitation, recruitment, or encouragement of Plaintiffs' employee to terminate employment with Plaintiffs during the one-year period after Defendant Brosa's termination. (Doc. 1-2 ¶ 2(c); Compl. ¶ 154–55, 157.) Defendant Brosa argues that there are insufficient factual allegations identifying a breach of this covenant. (Doc. 25 at 8–9.) But Plaintiffs recount that Defendant Brosa sent an airline ticket to Plaintiffs' sales executive from an airport located less than twenty minutes from Defendant Apex's headquarters. (Compl. ¶ 92.) This contact occurred in June 2025 (*id.*), which falls within the one-year restriction period from the date of Defendant Brosa's termination. Later, the executive terminated her employment with Plaintiffs. (*Id.*) A reasonable inference can be made that Defendant Brosa's actions were, at minimum, an attempt to encourage Plaintiffs' employee leave her employment. When taken as true, these allegations establish breach of the non-recruitment covenant under Count Four.

. . .

---

[4] The non-recruitment covenant in the Brosa Agreement (Doc. 1-2 ¶ 2(c)) was not challenged by Defendant Brosa as unenforceable.

In Count Six, Plaintiffs claim that Defendant Tankersley violated the confidentiality covenant that prohibited Defendant Tankersley from using or disclosing "Confidential Information" to others outside the Company. (Doc. 1-1 ¶ 4; Compl. ¶ 183.) Confidential Information included "business systems and computer programs." (Doc. 1-1 ¶ 3; Compl. ¶ 62.) Defendant Tankersley contends that there are insufficient factual allegations identifying a breach of this covenant. (Doc. 28 at 11.) But Plaintiffs allege Defendant Tankersley breached those contractual terms by "using and/or disclosing [Plaintiffs'] computer codes, processes, techniques . . . to develop copies of [Plaintiffs'] customer-specific applications for Apex." (Compl. ¶ 188.) These facts, while merely allegations at this stage, are sufficient to identify a breach of the Tankersley Agreement under Count Six.

### 4. *Damages*

In each breach of contract claim, Plaintiffs allege in a copy-and-paste fashion that they suffered "irreparable injury, in addition to monetary damages" because of the breach. (Compl. ¶¶ 161, 192.) Defendants Brosa and Tankersley argue that these allegations are illusory, not grounded in facts, and not connected to the alleged breach. (Doc. 25 at 11; Doc. 28 at 11–12.) In response, Plaintiffs argue that they have sufficiently pled, "among other things, irreparable harm," which Plaintiffs contend is a cognizable type of damage in a breach of contract claim. (Doc. 36 at 16–17; Doc. 38 at 15.)

"Arizona has long held that damages for breach of contract are those damages which arise naturally from the breach itself or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered the contract." *All Am. Sch. Supply Co. v. Slavens*, 125 Ariz. 231, 233 (Ariz. 1980). An irreparable harm is one that cannot be adequately remedied by monetary damages and can take many forms. *See, e.g.*, *Toma v. Fontes*, 258 Ariz. 109, 127 (Ariz. App. 2024); *Best W. Int'l Inc. v. Doe*, 2006 U.S. Dist. LEXIS 77942, at *17–18 (D. Ariz. Oct. 24, 2006) (holding that destruction of corporate goodwill may be irreparable); *Phx. Orthopaedic Surgeons v. Peairs*, 164 Ariz. 54, 59 (Ariz. App. 1989) ("Once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected.").

Here, Plaintiffs expressly allege that each covenant protects "legitimate competitive advantages, relationships with customers and employees, trade secrets and confidential information, and other valid business interests" and breach creates "irreparable injury." (Compl. ¶¶ 155, 161, 186, 192; *see also* Doc. 1-2 ¶ 2(e)(1).) Both the Brosa and Tankersley Agreements contemplate that damages for breach may encompass equitable remedies to protect Plaintiffs' business interests. (*See* Doc. 1-1 at 3; Doc. 1-2 at 6; Compl. ¶¶ 96–97.) These facts and the plain language of the Agreements are sufficient to plead damages at this stage because they identify a harm arising from breach that is both legally cognizable and contemplated by the parties in the Agreements. Counts Four (as related to the non-recruitment covenant) and Six satisfy the pleading standard and will not be dismissed.

## C.    Count Eight: Tortious Interference with Contract or Expectancy

Plaintiffs bring a state law tortious interference claim against Defendant Apex. (Compl. ¶¶ 201–07.) The claim asserts two forms of interference: (1) interference with Plaintiffs' business expectancies and contracts with current or prospective customers; and (2) interference with Plaintiffs' contracts with its employees. (*Id.*) Defendant Apex argues that this claim should be dismissed because Plaintiffs' allegations amount to nothing more than a recitation of the elements of the claim and lack specificity. (Doc. 22 at 8–9.)

To plead a claim for tortious interference with contractual relations, the plaintiff must allege the following: "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferer, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Safeway Ins. Co., Inc. v. Guerrero*, 210 Ariz. 5, 9 (Ariz. 2005). Improper conduct is the crux of this claim, and "a competitor does not act improperly if his purpose at least in part is to advance his own economic interests." *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 483 (Ariz. App. 1988).

Plaintiffs' allegations ultimately fail to satisfy the third element that requires Defendant Apex to intentionally interfere with Plaintiffs' contractual relationships. First, Plaintiffs allege that Defendant Apex knew of and intentionally interfered with Plaintiffs'

customer relationships "by misusing BVTA's software programs, techniques, processes and other confidential and proprietary information . . . to cause customers to select Apex's proposals over those submitted by BVTA." (Compl. ¶ 205.) This allegation is conclusory and lacks reasoning and factual support. For example, Plaintiffs do not allege a higher incidence—or even a *single* incident—of losing bids or customers cancelling existing contracts in the time that Defendant Apex supposedly interfered with those relationships.

Second, Plaintiffs allege that Defendant Apex knew of and intentionally interfered with Plaintiffs' employee relationships "by inducing them to commit material breaches of contract." (*Id.* ¶ 204). Plaintiffs advance the following factual basis to support this allegation: (1) Defendant Brosa breached the non-recruitment covenant by sending "airline ticket information from his personal Gmail account to the work email account of a BVTA sales executive" (*id.* ¶ 92); (2) Defendant Brosa breached the confidentiality covenant by extracting numerous files and contacts that belonged to Plaintiffs (*id.* ¶¶ 66–84); and (3) Defendant Tankersley breached the confidentiality covenant by using or disclosing his knowledge and skills obtained through his employment to make copies of the ProTrack software (*id.* ¶ 91). These facts, even if they are true, do not establish an inference that Defendant Apex induced Defendants Brosa and Tankersley to breach their contractual obligations to Plaintiffs. For instance, the Court already found no allegations suggesting that Defendant Apex knew of, let alone induced, Defendants Brosa and Tankersley's use or disclosure of Plaintiffs' confidential or trade secret information. As for Defendant Brosa's alleged breach of the non-recruitment covenant,[5] the fact that Defendant Brosa used his personal email account indicates that Defendant Apex was not involved in, much less induced, that specific communication. Finally, the fact that Defendants Brosa and Tankersley terminated their employment with Plaintiffs and now work for Defendant Apex is insufficient to allege or infer inducement. *See, e.g.*, *Solar Optimum Inc.*, 2024 U.S. Dist. LEXIS 80983, at *3, 24 (allegations that an executive of the defendant company sent a

---

[5] The Court does not consider Plaintiffs' responsive remarks that the sales executive now works for Defendant Apex because that allegation does not appear on the face of the Complaint. (Doc. 37 at 8.)

1    non-disclosure agreement to the plaintiff's employee "to distribute to the other employees

2    they were attempting to hire" were sufficient to plead a tortious interference claim).

3         Because Plaintiffs fail to allege the requisite elements of a tortious interference

4    claim with respect to its customer and employee relationships, the Court will dismiss Count

5    Eight. This pleading defect may be cured by amendment, and this Court will grant Plaintiffs

6    leave to do so. *Lopez*, 203 F.3d at 1130.

7         **D.    Count Nine: Unfair Competition**

8         Plaintiffs bring a common law tort claim for unfair competition against all

9    Defendants. (Compl. ¶¶ 208–16.) Unfair competition claims are based on principles of

10   equity and encompasses several tort theories, including trademark infringement, false

11   advertising, and misappropriation. *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124

12   (Ariz. App. 1998). Here, Plaintiffs assert their claim under a theory of misappropriation.[6]

13   (Compl. ¶¶ 208–16.)

14        Defendant Brosa argues that this claim is preempted by the AUTSA. (Doc. 25 at

15   12.) The AUTSA preempts tort claims that provide a civil remedy for misappropriation of

16   a trade secret, but not for misappropriation of confidential information. A.R.S. § 44-407;

17   *Orca II*, 236 Ariz. at 181 ("AUTSA does not displace common-law claims based on alleged

18   misappropriation of confidential information that is not a trade secret."); *Joshua David*

19   *Mellberg LLC*, 96 F. Supp. 3d at 963 (permitting the plaintiff to amend a claim of unfair

20   competition based on misappropriation of confidential information). In determining

21   whether Plaintiffs' tort claim survives the AUTSA's preemptive force, the Court must

22   identify if any portion of the claim is based on the alleged misappropriation of information

23   distinguishable from trade secrets.

24   . . .

---

25

26   [6] The Arizona Supreme Court has declined to recognize a common law claim for unfair
     competition based on misappropriation. *Orca II*, 236 Ariz. at 184. In the absence of a state

27   pronouncement otherwise, district courts sitting in Arizona have permitted this claim to
     proceed. *See, e.g.*, *Joshua David Mellberg LLC*, 96 F. Supp. 3d at 963; *Athene Annuity &*

28   *Life Co. v. Athene Grp. Ltd.*, No. CV-24-01120-PHX-JZB, 2025 U.S. Dist. LEXIS 165062,
     at *15 n.7 (D. Ariz. Jul. 18, 2025); *Solar Optimum Inc.*, 2024 U.S. Dist. LEXIS 80983, at
     *29

Plaintiffs argue that their unfair competition claim is based on the misappropriation of "confidential information," not trade secrets. Such confidential information includes "customer specific project management software applications." (Doc. 36 at 17.) But that category of information was successfully pled as a trade secret, as discussed *infra*. Nowhere in their Complaint or responsive briefing do Plaintiffs distinguish what other information is "confidential" but not a "trade secret." In fact, Plaintiffs appear to allege that all their confidential information are trade secrets, making it implausible that Defendant Brosa could misappropriate one without the other. (Compl. ¶ 100.) As currently pled, the unfair competition claim against Defendant Brosa is preempted under AUTSA.

Neither Defendants Apex nor Tankersley argue preemption. Rather, they argue that Plaintiffs fail to allege specific conduct supporting misappropriation of Plaintiffs' confidential information. (Doc. 22 at 11; Doc. 28 at 12.) In considering these arguments, the Court will apply the same legal definition of "misappropriation" as set forth in Counts One and Two under the DTSA and AUTSA.[7] As to Defendant Tankersley, the Court already found that Plaintiffs alleged sufficient facts that he misappropriated Plaintiffs' customer-specific computer software and harmed Plaintiffs. (*See* Compl. ¶¶ 57, 91, 93–94.) These factual assertions form the basis for Plaintiffs' unfair competition claim (*Id.* ¶ 209) and are similarly sufficient to allege misappropriation. However, Plaintiffs allegations fall short when it comes to Defendant Apex. Plaintiffs allege no specific conduct or facts suggesting that Defendant Apex itself is currently misappropriating, or has misappropriated, any of Plaintiffs' confidential information. For these reasons, the Court will dismiss Count Nine as to Defendant Apex. Because the pleading defects can be cured with additional, well-pled facts, the Court will grant Plaintiffs leave to amend Count Nine against Defendants Brosa and Apex only. *Lopez*, 203 F.3d at 1130.

. . .

---

[7] Defendants Apex and Tankersley do not suggest, and this Court is not aware of, a unique legal definition or standard for misappropriation in the common-law unfair competition context. *See, e.g.*, *Joshua David Mellberg LLC*, 96 F. Supp. 3d at 961, 962–63 (declining to identify a standard for misappropriation in an unfair competition claim); *Athene Annuity & Life Co.*, 2025 U.S. Dist. LEXIS 165062, at *15 n.7 (noting that the Arizona Supreme Court declined to recognize unfair competition claims based on misappropriation).

**IV.    CONCLUSION**

The Court will dismiss—and grant Plaintiffs leave to amend—Counts One, Two and Eight against Defendant Apex, Count Five against Defendant Brosa, and Count Nine against Defendants Brosa and Apex. Count Three and the portion of Count Four pertaining to the non-solicitation covenant will be dismissed with prejudice and without leave to amend. The claims remaining at this stage include Counts One and Two against Defendants Tankersley and Brosa, Count Four against Defendant Brosa as it pertains to the non-recruitment covenant, Count Six against Defendant Tankersley, Count Seven against Defendant Brosa, and Count Nine against Defendant Tankersley.

No later than fourteen days from the date of this Order, Plaintiffs may file an amended complaint and a separate Notice of Filing Amended Complaint with an attached redlined copy showing the changes between the Complaint and the amendment. No new claims may be added to an amendment absent leave of court pursuant to Federal Rule of Civil Procedure 15 and Local Rule 15.1. If Plaintiffs do not file an amended complaint in the time prescribed, the Clerk of Court is directed to dismiss Defendant Apex as a party to this matter without further order of the Court.

Plaintiffs' Motion for Preliminary Injunction (Doc. 17) remains pending. The Court will set a hearing on Plaintiffs' Motion for Preliminary Injunction, and the parties shall abide by the instructions set forth in greater detail below.

**IT IS THEREFORE ORDERED** granting Defendant Apex Imaging Services Incorporated's Motion to Dismiss (Docs. 21, 22). Counts One, Two, Eight, and Nine against Defendant Apex will be dismissed.

**IT IS FURTHER ORDERED** denying Defendant Todd Tankersley's Motion to Dismiss (Docs. 27, 28).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendant Blake Brosa's Motion to Dismiss (Docs. 24, 25). Count Three, Five, Nine, and the portion of Count Four pertaining to the non-solicitation covenant against Defendant Brosa will be dismissed.

**IT IS FURTHER ORDERED** that, no later than fourteen days from the date of this Order, Plaintiffs may file an amended complaint and a separate Notice of Filing Amended Complaint with an attached redlined copy showing the changes between the Complaint and the amendment. Plaintiffs may only amend Counts One, Two, and Eight as to Defendant Apex, Count Five as to Defendant Brosa, and Count Nine as to Defendants Apex and Brosa. No new claims may be added to an amendment absent leave of court pursuant to Federal Rule of Civil Procedure 15 and Local Rule 15.1.

**IT IS FURTHER ORDERED** directing the Clerk of Court to dismiss Defendant Apex as a party to this matter if Plaintiffs do not file an amended complaint within fourteen days from the date of this Order.

**IT IS FURTHER ORDERED** setting a hearing on Plaintiffs' Motion for Preliminary Injunction (Doc. 17) on **January 27, 2026, at 2:00 PM (Arizona time)**, before District Judge John J. Tuchi in Courtroom 505, Sandra Day O'Connor Federal Courthouse, 401 West Washington Street, Phoenix, Arizona 85003. Each side will have **two hours**— that is, two hours for Plaintiffs collectively and two hours for Defendants collectively—for their presentation to the Court, including all evidence and legal argument.

**IT IS FURTHER ORDERED** that the parties shall jointly prepare and file a pre-hearing statement by **January 20, 2026**, setting forth the following information with regard to their presentation on Plaintiffs' Motion for Preliminary Injunction (Doc. 17):

A. **WITNESSES**

Because the parties rely on witness statements in their briefing, no party shall conduct direct examination of witnesses at the hearing, but rather the Court will rely on declarations and affidavits the parties have filed in support of their briefing as of September 12, 2025, for direct testimony. However, the opposing party may conduct cross-examination of any witness. Accordingly, in the joint pre-hearing statement, the parties shall separately list the names of their witnesses upon which they rely, the witnesses' respective addresses, and whether a fact or expert witness.

. . .

The parties shall adhere to the following provision and include it in this section of the joint pre-hearing statement: "Each party understands that it is responsible for ensuring that the witnesses on whose testimony the party will rely are subpoenaed. Each party further understands that any witness whose testimony is offered to the Court shall be listed on that party's list of witnesses, and that party cannot rely on any witness having been listed or subpoenaed by another party."

The party conducting cross-examination of the opposing party's witnesses at the hearing shall determine which witnesses it calls to cross-examine. Accordingly, in the joint pre-hearing statement, each party shall separately list the opposing party's witnesses it plans to cross-examine and the order in which it will cross-examine them. The time taken to cross-examine a witness counts against the side conducting the cross-examination.

**B.    EXHIBITS**

The Court will rely on the exhibits submitted with the parties' briefs as of September 12, 2025**.** No additional exhibits will be admitted. The parties shall list any objections it has to the opposing party's exhibits in the pre-hearing statement. The parties shall adhere to the following provision and include it in this section of the joint pre-hearing statement: "Each party hereby acknowledges that, by signing this joint pre-hearing statement, any objections not specifically raised herein are waived."

**C.    PROPOSED BOND AMOUNT**

The parties shall each provide a proposed bond amount under Federal Rule of Civil Procedure 65(c) in the event the Court grants Plaintiffs' Motion for Preliminary Injunction. Each party's proposed bond amount should be listed in the pre-hearing statement.

Dated this 1st day of December, 2025.

_____
Honorable John J. Tuchi
United States District Judge