**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bureau Veritas Technical Assessments LLC, *et al.*, | No. CV-25-02339-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Blake Brosa, *et al.*, | |
| Defendants. | |

Before the Court is Plaintiffs Bureau Veritas Technical Assessments, LLC and Bureau Veritas North America, Inc.'s Motion for Preliminary Injunction (Doc. 17, Mot.), to which Defendants Apex Imaging Services, Inc. ("Apex"), Blake Brosa, and Todd Tankersley filed a collective response (Doc. 44, Resp.), and Plaintiffs replied (Doc. 53, Reply). The Court held an evidentiary hearing on the Motion on January 27, 2026. Having considered the briefing and all evidence and testimony presented by the parties, the Court denies the Motion.

## I.    BACKGROUND

Plaintiffs provide project management services for multi-site customers. (Doc. 18, Susi Decl., ¶ 9.) Apex provides general construction services for multi-site customers. (Doc. 44-1, Cardona Decl., ¶ 6.) Both companies use project management software; Plaintiffs' software is known as "ProTrack" (Doc. 19, McNeice Decl., ¶ 14), while Apex's software is branded "Apexview" (Cardona Decl. ¶ 20).

. . .

Mr. Tankersley worked as Plaintiffs' Senior Product Developer for several years and helped develop and operate ProTrack. (McNeice Decl. ¶¶ 12–14; Doc. 44-2, Tankersley Decl., ¶ 8.) As a part of his employment, Mr. Tankersley entered into a Confidentiality Agreement ("Tankersley Agreement") that prohibited the copying, removal, use, or disclosure of Plaintiffs' confidential information without permission. (Doc. 17-9 at 2–3.)

Mr. Brosa worked as Plaintiffs' Executive Vice President of Sales and was involved in, *inter alia*, planning annual sales, leading Plaintiffs' emergence into the electric vehicle charging ("EVC") market, and preparing large responses to Requests for Proposals ("RFPs"). (Susi Decl. ¶¶ 23–24; Hr'g Tr. at 65:19–66:24.) As a part of his employment, Mr. Brosa entered a Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Rights Agreement ("Brosa Agreement"). (Doc. 17-8; Hr'g Tr. at 55:8–57:18.) As relevant here, the Brosa Agreement prohibited the use or disclosure of Plaintiffs' confidential information and retention of Plaintiffs' company property and confidential information. (Doc. 17-8 at 2–3.)

In September 2024, Mr. Brosa met Apex's Chief Operating Officer Dan Cardona while attending an event in Scottsdale, Arizona. (Hr'g Tr. at 68:6–13.) Subsequently, Mr. Cardona extended him an offer of employment. (*Id*. at 68:17–69:2, 71:11–17.) As Mr. Brosa recalls, Mr. Cardona expressed to him that there was an "immense opportunity" for Apex to become a "total turn-key solution" and "world-class one-firm-firm," and together they could "kick some ass." (*Id*. at 68:22–70:19, 74:20–75:19.) Mr. Brosa accepted the job offer on October 17, 2024. (*Id*. at 77:2–78:5.)

On November 19, 2024, Mr. Brosa informed Plaintiffs that he "will be transitioning [his] career back to [his] roots as a self-perform general contractor." (Doc. 17-1 at 2.) Over one month later, after apparently learning that Mr. Brosa began working with Apex, Plaintiffs sent Mr. Brosa and Apex a letter reminding Mr. Brosa of his post-employment obligations set forth in the Brosa Agreement. (Doc. 17-2.) Around this time, Mr. Brosa still possessed his work laptop for the purpose of ensuring that Plaintiffs would pay him his last

commission check. (Hr'g Tr. at 63:8–23; 107:12–21.) While in possession of the laptop, Mr. Brosa acknowledged that he accessed his "contacts list one time." (*Id*. at 63:24–25.)

In April 2025, Mr. Tankersley terminated his employment with Plaintiffs and began working as Apex's Director of Systems the following month. (Tankersley Decl. ¶¶ 2–3, 10.) It is unclear whether Mr. Tankersley's responsibilities included working with ProTrack at the time he stopped working for Plaintiffs. (*Compare* Tankersley Decl. ¶¶ 4, 9 *with* Hr'g Tr. at 50:25–51:24.)

At some point, Mr. Brosa returned the laptop to Plaintiffs. Plaintiffs subsequently retained Mr. David Greetham, a digital forensic examiner, to examine the laptop. (Doc. 20, Greetham Decl., ¶¶ 11–13.) Mr. Greetham prepared a forensic image of the laptop that revealed Mr. Brosa had repeatedly connected an external WD Elements 2621 USB device ("External Drive") to the laptop. (*Id*. ¶ 16.) According to Mr. Greetham, Mr. Brosa accessed or created "a substantial number of files and folders" on the External Drive. (*Id.*)

On July 3, 2025, Plaintiffs sued Defendants asserting—as relevant here—misappropriation of trade secrets under federal and state law and breach of the Brosa and Tankersley Agreements.[1] According to Mr. Cardona, Apex instructed Mr. Brosa to deliver the External Drive to Apex's legal counsel soon after the lawsuit was filed. (Cardona Decl. ¶ 12.) Mr. Brosa did so and had no access to the External Drive since. (Hr'g Tr. at 109:18–111:21.)

On August 1, 2025, Plaintiffs moved for a preliminary injunction against Defendants. While briefing was ongoing, the parties nominated two forensic consultants to conduct an examination of the External Drive (Doc. 45) and the Court appointed Mr. Brian J. Halpin. (Doc. 52). Mr. Halpin's examination of the External Drive revealed that it contained hundreds, perhaps thousands, of files. (*See* Doc. 66, Halpin Decl.) Plaintiffs now

---

[1] Originally, Plaintiffs moved for injunctive relief based on their claims that Mr. Brosa breached the confidentiality, non-recruitment, non-solicitation and non-compete covenants contained in the Brosa Agreement, but the claims pertaining to the latter two have since been dismissed. (*See* Docs. 71, 84; Hr'g Tr. at 18:4–6.) At the evidentiary hearing, Plaintiffs' counsel clarified that they no longer seek injunctive relief based upon Mr. Brosa's alleged recruitment of Ms. Lynelle Grimes. (Hr'g Tr. at 130:11–132:7.) Accordingly, the only breach of the Brosa Agreement before the Court is based upon the confidentiality covenant.

1   move the Court to enjoin Defendants "from disclosing, accessing, uploading, downloading,
2   copying, printing, or transferring or otherwise using any of Plaintiffs' confidential or trade
3   secret information," return (Doc. 17-10; Hr'g Tr. at 139:12–140:9.) Additionally, Plaintiffs
4   request that Defendants be ordered to return Plaintiffs' property and confidential and trade
5   secret information, identify all devices or accounts that were used to access the confidential
6   or trade secret information, and submit those devices or accounts to a third-party forensic
7   examiner of Plaintiffs' choosing. (Doc. 17-10; Hr'g Tr. at 139:12–140:9.)

8   **II.    LEGAL STANDARD**

9       In order to obtain a preliminary injunction, Plaintiffs must show that "(1) [they are]
10  likely to succeed on the merits, (2) [they are] likely to suffer irreparable harm in the absence
11  of preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an injunction
12  is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing
13  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008)).

14  **III.   ANALYSIS**

15      **A.    Evidentiary Objections**

16      In setting the evidentiary hearing, the Court ordered that only the declarations,
17  affidavits, and exhibits submitted as of September 12, 2025 would be considered. (Doc. 71
18  at 26–27.) At issue here, Plaintiffs request the Court to accept and consider evidence
19  submitted after the September 12th cutoff date that includes: (1) Mr. Halpin's declaration
20  filed on October 3, 2025 (Doc. 66); (2) Mr. Greetham's supplemental declaration filed on
21  October 3, 2025 (Doc. 67); and (3) a document entitled "3Q 2023 PM Sales Update"
22  offered at the evidentiary hearing ("Sales Document") (Hr'g Tr. at 118:7–23).

23      Plaintiffs argue that the declarations arise from the Court-sanctioned expedited
24  discovery and appointment of Mr. Halpin to analyze the External Drive and were filed and
25  served with sufficient time for Defendants to prepare a response. (Doc. 86 at 3.) Plaintiffs
26  offer no argument as to the Sales Document. Defendants object to the introduction of
27  evidence submitted after the cutoff date. According to Defendants, they were unaware of
28  Plaintiffs' intention to rely on the two declarations until the first prehearing statement draft

was circulated on the eve of the deadline to file it. (*Id*. at 6.) Had they known, Defendants maintain that they would have prepared a rebuttal expert report to meet that of Mr. Greetham. (*Id*.) As to the Sales Document, it too was submitted long after the cutoff date. Notably, Plaintiffs do not even list it as an exhibit in the Joint Pre-Hearing Statement. (*See* Doc. 86 at 4–5.)

The Court will overrule Defendants' objection as to Mr. Halpin's declaration. As the third-party neutral appointed by the Court, Mr. Halpin generated a ninety-three-page report of the contents of the External Drive and, insofar as the Court is aware, timely shared it with both parties in accordance with the Court's minute entry dated August 25, 2025. (*See* Halpin Decl. ¶ 2.) The information contained in Mr. Halpin's declaration and report is bereft of interpretive gloss or endorsement. Because the forensic report and accompanying declaration were neutral, court-ordered, and presented to both sides long before the hearing took place, the Court finds no prejudice or hardship to either party in considering Mr. Halpin's declaration.

Defendant's objection as to the other evidence is sustained. Unlike Mr. Halpin's declaration, the supplemental declaration of Mr. Greetham is far from neutral. In it, Mr. Greetham analyzes Mr. Halpin's report to extrapolate conclusions that favor Plaintiffs. The merit of those conclusions is not for the Court to decide now. Rather, the Court observes that Plaintiffs knew of the cutoff date as early as December 1, 2025 when the Court entered its order setting the evidentiary hearing (*see* Doc. 71 at 26–27) and could have requested leave to use the supplemental declaration any time thereafter. They did not. Instead, they delayed notice of using Mr. Greetham's supplemental declaration until the eve of the prehearing statement deadline. As for the Sales Document, it was not only submitted after the cutoff date, but it was not properly noticed as an exhibit in the Pre-Hearing Statement. This trial-by-ambush exercise is the kind that the Court attempted to avoid in setting the cutoff date. Accordingly, the Court will not consider Mr. Greetham's supplemental declaration, the Sales Document, or counsel's oral arguments related thereto. . . .

**B.    Likelihood of Success on the Merits**

Under the first *Winter* element, Plaintiffs must show that they are likely to succeed on the merits of their claims. This factor is the most important of the *Winter* elements. *Garcia*, 786 F.3d at 740. "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements." *Id.* (citation modified). The Ninth Circuit employs a sliding scale approach in which "serious questions going to the merits and a hardship balance that tips sharply toward the [movant] can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 2877 (2014) (citation modified).

The standard required by the first *Winter* element becomes "doubly demanding" when a movant seeks a mandatory injunction rather than a prohibitory injunction. *Id.* The former injunction mandates a party to take action, while the latter restrains a party from action. *See id.* When mandatory relief is sought, the movant must meet a heightened burden by demonstrating that the facts and law "clearly favor" the movant. *Id.* Neither party briefed whether Plaintiffs' injunctive relief is of the prohibitory or mandatory variety. The Court will assume that the relief sought is prohibitory and declines to apply a heightened standard to Plaintiffs' burden of showing a likelihood of success on the merits.

1.    *Trade Secret Misappropriation*

Plaintiffs move for injunctive relief based on two claims for trade secret misappropriation under the Defend Trade Secrets Act and its state law counterpart Arizona Uniform Trade Secrets Act. Courts in this district analyze these claims together because the elements are identical. *See ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 U.S. Dist. LEXIS 223194, *2–3 (D. Ariz. Sep. 18, 2020). To establish a claim for trade secret misappropriation, a plaintiff must show: "(1) that the plaintiff possessed a trade secret[;] (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)).

1

a.    <u>Trade Secrets</u>

2       Trade secrets are defined broadly and include three components: "(1) information,

3  (2) that is valuable because it is unknown to others, and (3) that the owner has attempted

4  to keep secret." *Id.* at 657; *see also* 8 U.S.C. § 1839(3); A.R.S. § 44-401(4). Even though

5  trade secrets are defined broadly, "[t]he plaintiff should describe the subject matter of the

6  trade secret with sufficient particularity to separate it from matters of general knowledge

7  in the trade or of special knowledge of those persons . . . skilled in the trade." *Inteliclear*,

8  978 F.3d at 658 (citation and internal quotation marks omitted).

9       At the evidentiary hearing, Mr. Brosa confirmed that he copied files from his work

10 laptop to the External Drive. (Hr'g Tr. at 84:3–89:2.) He testified that he would not be

11 surprised if ninety percent of the files contained on the External Drive were business-

12 related. (*Id*. at 64:23–65:3.) Of those files, Plaintiffs tendered three. The first is an executed

13 project proposal that contains the client's contact information, the scope of the work and

14 services, and project pricing. (Susi Decl. ¶ 36; Doc. 57-1.) The second is spreadsheet that

15 includes 2024 year-to-date project data for active projects. (Doc. 57-2.) The third document

16 depicted notes from an executive meeting that identified, *inter alia*, "Must Wins,"

17 including upcoming program rollouts and projects set to open in 2025. (Doc. 57-3.) The

18 Court refers to these three documents collectively as the "Business Documents."

19       Plaintiffs also submitted two emails that Mr. Brosa forwarded from his work

20 account to a personal account. The first was forwarded on November 27, 2024 and

21 contained a RFP he received from a client who was soliciting services for an EVC project.

22 (Doc. 57-4.) The last email was forwarded on December 2, 2024—Mr. Brosa's last day of

23 work with Plaintiffs—and contained the payment history of that same EVC client. (Doc.

24 57-6.) The Court refers to these two emails collectively as the "EVC Emails."

25       Additionally, Mr. Greetham declared that Mr. Brosa accessed Outlook files named

26 "Client Emails" and "BV Stock Emails" on November 25, 2024 and "BV Stock contacts"

27 on December 20, 2024, (Greetham Decl. ¶¶ 26, 28.) Mr. Greetham suspects these files

28 "likely contain a substantial number of BVTA emails, calendar invites, and contacts," and

"contact information in relation to BV stock." (*Id*. at ¶ 27.) The Court refers to these files as the "Outlook Files."

Plaintiffs contend that ProTrack, the three Business Documents, the Outlook Files, and the EVC Emails are trade secrets.[2] (Reply at 4–6; Doc. 54, Supp. Susi Decl., ¶¶ 5–10). There is sufficient evidence in the record to show that ProTrack, the Business Documents and EVC Emails are valuable by virtue of not being known to others. According to Mr. McNeice, Plaintiffs' Vice President of Digital Product Innovation, ProTrack was transformed from a base software into its current form through the work of Mr. Tankersley and others over the course of years. (McNeice Decl. ¶ 19.) Mr. McNeice also declared that ProTrack is "often a determinative factor for customers in deciding which proposal to an RFP is successful," demonstrating just how valuable the software is to Plaintiffs' business. (McNeice Decl. ¶ 17.) As for the Business Documents, the content of those documents clearly reveals Plaintiffs' weaknesses, strategies, and current streams of revenue, and would allow a competing company to capitalize off Plaintiffs' shortcomings or divert potential business if known. Lastly, the EVC Emails contain a RFP from a client and related payment history. This information exposes how lucrative this account is for Plaintiffs and could inspire a competitor to seek out that client's business knowing what kinds of services it seeks and for what price.

There is also sufficient evidence to show that ProTrack, the Business Documents and EVC Emails were subject to Plaintiffs' efforts to maintain their secrecy. Ms. Joanne Susi, Plaintiffs' current Vice President of Business Development, testified that the Business Documents and EVC Emails are not accessible outside of Plaintiffs' business (Supp. Susi Decl. ¶ 10) and are protected by confidentiality agreements, internal code of ethics, and password protection. (Susi Decl. ¶¶ 19–21.) ProTrack is also protected by confidentiality covenants. (Doc. 17-8 at 2; Doc. 17-9 at 2.) There are additional markers of

---

[2] Separately, Plaintiffs submitted five other emails that Mr. Brosa forwarded to himself on November 25, 2024. (Docs. 57-9–57-13.) Each email contained Plaintiffs' marketing materials and related content. Plaintiffs submitted these emails to support their claim that Mr. Brosa violated the non-solicitation covenant (Reply at 9), which has since been dismissed. *See* footnote 1, *supra* at 3. Plaintiffs do not identify the Outreach Emails as a trade secret (*see* Reply at 4–6), so the Court will not analyze them as such.

confidentiality made apparent through other testimony and the documents themselves. One of the Business Documents was an executed response to an RFP that, according to Mr. Brosa himself, is typically treated as confidential and would have been accompanied by a non-disclosure agreement. (Hr'g Tr. at 66:25–67:11.) One of the EVC Emails evinced clear instructions that it was to be treated as confidential. (*See* Doc. 57-4.) Other Business Documents were clearly internal files prepared for "executive meetings" that identified future "must-win" accounts, set out future sales goals and areas of improvement (Doc. 57-3), and contained active client names and related project and financial information (Doc. 57-2). The revealing nature of the information contained in these documents, combined with the measures undertaken by Plaintiffs to maintain their secrecy, sufficiently demonstrates that they are trade secrets.

The Outlook Files, however, are far more abstract. Based solely on the file names, Mr. Greetham speculates that the Outlook Files contain a "substantial number of BVTA emails, calendar invites, and contacts," and potentially "contact information in relation to BV stock." (Greetham Decl. ¶¶ 26–28). Mr. Greetham's speculation does not assist the Court in determining whether the content of these files derive their value by virtue of being unknown to others or that Plaintiffs attempted to keep these files secret. For instance, a calendar invite, email, or contact could be sent to or from anyone in the world with an email account. Without more evidence to place the Outlook Files in context, they cannot be deemed a trade secret.

b. Misappropriation

Misappropriation can occur: (1) by acquisition through improper means; or (2) by disclosure or use of a trade secret with knowledge or with reason to know that it was acquired through improper means. 18 U.S.C § 1839(5); A.R.S. § 44-401(2). Improper means includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." 18 U.S.C § 1839(6); A.R.S § 44-401(2). While improper means include several kinds of conduct, "[m]ere possession of trade secrets by a departing employee is not sufficient to establish misappropriation or show injury." *Cutera,*

*Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1207 (E.D. Cal. 2020) (analyzing misappropriation under the California state law counterpart of the DTSA). Rather, the purported misappropriation must extend beyond mere possession. *See id.* at 1207–08 (allegations that the defendant deployed a sales method claimed to be a trade secret were sufficient to plead misappropriation); *see also Early Warning Servs. LLC*, 2025 LEXIS 89594, at *12–13 (allegations that the defendant published previously unknown information without the plaintiff's consent were sufficient to plead misappropriation); *Fire Sec. Elecs. & Commc'ns Inc. v. Nye*, No. CV-23-02730-PHX-DLR, 2024 U.S. Dist. LEXIS 25575, at *10–11 (D. Ariz. Feb. 13, 2024) (evidence of a former employee coordinating with a current employee to copy files supported misappropriation).

Plaintiffs argue that Mr. Brosa misappropriated Plaintiffs' trade secrets "by making copies of them on his Elements USB Device and forwarding them to his personal Gmail account at or around the time of his departure from BVTA." (Mot. at 11.) Mr. Brosa does not contest that he did, in fact, acquire these documents and emails without Plaintiffs' permission. (Hr'g Tr. at 81:13–82:9.)

Mr. Brosa's motivations for his conduct vary. In a letter sent in July 2025, Apex's attorney explained that Mr. Brosa's "intent of keeping these was not nefarious, but an attempt to be helpful after he left . . . he downloaded a number of files so that if/when someone reached out, he had basic information to remind himself about the client or the project . . ." (Doc. 17-7 at 6.) In his declaration, Mr. Brosa stated that he copied files to the External Drive "to have access to forms [he] had developed, and to have access to personal information unrelated to [his] work for BVTA." (Doc. 44-3 ¶ 6.) At the hearing, Mr. Brosa testified that he copied files to the External Drive because he feared that Apex would "crash" and "wasn't a for sure bet," and these files would be something he would need if he returned to work for Plaintiffs. (Hr'g Tr. at 86:6–12.) He acknowledged that his conduct was ultimately done with "poor judgment." (*Id*.) As for sending the EVC Emails, Mr. Brosa testified that he sent them to himself "[o]ut of being a pure nerd." (*Id*. at 107:8–11.) He "was wildly excited to see how [the client] is doing this" and "was curious about it." (*Id*.)

1    And, in the event Plaintiffs asked Mr. Brosa about the project later, he "could go back and
2    look at the RFP." (*Id.*)

3         No matter which, or if any, of these theories constitute Mr. Brosa's true motivations,
4    the evidence plainly shows that he did not merely possess the information passively.
5    Rather, he actively copied and stored the Business Documents and sent himself the EVC
6    Emails without permission. This is precisely the kind of conduct that falls within the
7    inscription of trade secret law and amounts to misappropriation.

8         As to Mr. Tankersley, Plaintiffs argue he misappropriated ProTrack simply by
9    having knowledge of that software and working in a "nearly identical role" with Apex that
10   uses the same QuickBase platform. (Mot. at 12.) Defendants argue, and the Court agrees,
11   that Plaintiffs' theory primarily relies upon the inevitable disclosure doctrine. "The
12   rationale underlying the inevitable disclosure doctrine is that a plaintiff may establish
13   threatened misappropriation simply by the fact that the defendant's new employment will
14   inevitably lead that defendant to rely on plaintiff's trade secrets . . . it constitutes a narrow
15   avenue for courts to provide injunctive relief for threatened misappropriation of trade
16   secrets." *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 3:21-cv-01631-HZ, 2022
17   U.S. Dist. LEXIS 2804, at *17–19 (D. Or. Jan. 3, 2022) (citation modified). This doctrine
18   is not recognized in the Ninth Circuit or the State of Arizona and the Court declines to
19   apply it here. *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001,
20   1027 (E.D. Cal. 2011) ("[A] court cannot presume that such disclosure is inevitable based
21   only on the fact of a business association between the defendant and the plaintiff's rivals.");
22   *Liss v. Exel Transp. Servs.*, No. CIV-04-2001-PHX-SMM, 2007 U.S. Dist. LEXIS 20555,
23   at *27 (D. Ariz. Mar. 20, 2007); *Kinship Partners, Inc.*, 2022 U.S. Dist. LEXIS 2804, at
24   *19.

25        Even if an inference of disclosure or use was permissible—which it is not—Apex
26   and Mr. Tankersley testified that he does not work with Apexview "on a day-to-day-basis"
27   in his current role. (Cardona Decl. ¶ 22; Tankersley Decl. ¶¶ 13–14.) Plaintiffs' witness
28   Mr. McNeice did not dispute this, and he confirmed that any suspicions he has regarding

Mr. Tankersley's use or disclosure of ProTrack are pure speculation. (Hr'g Tr. at 48:8–49:5.)

In the absence of evidence, Plaintiffs instead parse Mr. Tankersley's declaration—that he "*currently*" does not work with Apexview "*day-to-day*"—to mean that he works on Apexview infrequently or did so in the past. (Reply at 8 n.5.) But Mr. Tankersley avers that he has "not used any information [he] learned during [his] time with BVTA or BVNA to make any changes, revisions, additions or deletions to Apexview. It operates in the same manner in which it operated when [he] joined Apex." (Tankersley Decl. ¶ 14; *see also* Cardona Decl. ¶¶ 20–23.) This dispels Plaintiffs' theory that Mr. Tankersley "copied" or led others to copy ProTrack, and Plaintiffs show no evidence to suggest otherwise. Plaintiffs' evidence shows that Mr. Tankersley possessed knowledge of ProTrack but nothing more.

Finally, Plaintiffs argue that Apex misappropriated trade secrets by hiring Mr. Brosa and Mr. Tankersley. (Mot. at 11.) During oral argument, Plaintiffs contend that Apex poached Mr. Brosa and Mr. Tankersley with the goal of becoming a greater competitor of Plaintiffs. (Hr'g Tr. at 67:25–71:10.) This may be true, but "merely recruiting another company's employees does not meet the knowledge requirement for trade secret misappropriation," *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1182 (D. Wash. 2019), and the Court declines to make an inference that Apex will inevitably rely on purported trade secrets purely on account of employing Plaintiffs' former staff. *See Agency Solutions.Com, LLC*, 819 F. Supp. 2d at 1027 (rejecting the inevitable disclosure doctrine). Furthermore, the evidence in the record demonstrates that Apex had no knowledge that Mr. Brosa possessed the Business Documents or EVC Emails until Apex received Plaintiffs' letter on July 7, 2025. (Cardona Decl. ¶ 11.) According to Mr. Cardona, Mr. Brosa mailed the External Drive directly to Apex's legal counsel; Apex never had possession or access to it. (*Id.* ¶¶ 12–14.)

For the first time in reply, Plaintiffs advance that Apex is vicariously liable for Mr. Brosa's misappropriation under a theory of *respondeat superior*. (Reply at 7–8.) "A

1    business entity may be liable for intentional torts committed by an agent or employee, such

2    as misappropriation of trade secrets, even if the business has not authorized the activity, so

3    long as the activity falls within the scope of the agency or employment." *Gordon Grado*

4    *M.D., Inc. v. Phx. Cancer & Blood Disorder Treatment Inst. PLLC*, 603 F. Supp. 3d 799,

5    811 (D. Ariz. 2022). "Whether an employee's tort is within the scope of employment is

6    generally a question of fact. It is a question of law, however, if the undisputed facts indicate

7    that the conduct was clearly outside the scope of employment." *Engler v. Gulf Interstate*

8    *Eng'g, Inc.*, 258 P.3d 304, 309–10 (Ariz. Ct. App. 2011), *aff'd*, 280 P.3d 599 (Ariz. 2012).

9        Arizona courts follow the Restatement (Third) of the Law of Agency

10   ("Restatement") for evaluating whether an employee acts within the scope of his

11   employment. *Id*. at 309. According to § 7.07 of the Restatement, "[a]n employee acts within

12   the scope of employment when performing work assigned by the employer or engaging in

13   a course of conduct subject to the employer's control." *See also* comment (f) to

14   Restatement, § 7.07; Restatement § 1.01(f)(1) ("An essential element of agency is the

15   principal's right to control the agent's actions."). "A relationship of agency is not present

16   unless the person on whose behalf action is taken has the right to control the actor," which

17   is a "narrower and more sharply defined concept than domination or influence more

18   generally." Restatement § 1.01(f)(1). While "[c]onduct is considered within the scope of

19   employment when it is performed, at least in part, to benefit the employer," *Gordon Grado*

20   *M.D., Inc.*, 603 F. Supp. 3d at 811–12, it is not within the scope of employment when the

21   act "occurs within an independent course of conduct not intended by the employee to serve

22   any purpose of the employer," Restatement § 7.07.

23       Here, Plaintiffs contend that Apex is liable "because part of Brosa's theft occurred

24   during the scope of Brosa's employment while he was employed as Apex's Director of

25   Business Development." (Reply at 7.) Based on the evidence in the record,[3] there are two

---

[3] Plaintiffs make several new allegations in their First Amended Complaint that Mr. Brosa
accessed other documents on the External Drive while he was employed by Apex. (*See*
Doc. 74, FAC, ¶¶ 97–104.) But a preliminary injunction "may only be awarded upon a
clear showing of evidence that supports each relevant preliminary injunction factor. This
clear showing requires factual support beyond the allegations of the complaint . . ."
*Medcursor Inc. v. Shenzen KLM Internet Trading Co.*, 543 F. Supp. 3d 866, 870 (C.D. Cal.

instances of misappropriation that occurred while Mr. Brosa was an Apex employee: (1) he sent one of the EVC Emails containing the payment history to himself on December 2, 2024 (Susi Decl. ¶¶ 42–43; *see* Doc. 57-6); and (2) he accessed one of the Outlook Files titled "D:\Outlook EMAILS\BV Stock contacts.pst" on December 20, 2024 (Greetham Decl. ¶ 28). As to the first occurrence, Mr. Brosa testified—and Plaintiffs have not disputed—that Apex is not in the business of building or managing EVC projects. (Hr'g Tr. at 106:12–107:11.) Plaintiffs fail to show how this act, even if it occurred while Mr. Brosa was an Apex employee, benefits Apex or was done at Apex's instruction such that it occurred within the scope of employment. *See* Restatement § 7.07; *Gordon Grado M.D., Inc.*, 603 F. Supp. at 811–12. As to the second occurrence, the Court already determined that the Outlook Files do not constitute trade secrets, so there is no misappropriation for which Apex could be vicariously liable. Plaintiffs have failed to put forth sufficient evidence that shows a likelihood of success on their claim that Apex misappropriated their trade secrets.

### c.    Actual or Threatened Harm

The misappropriation, if established, must also cause or threaten to cause harm to the holder of the trade secret. "Damages are an essential element of a misappropriation of trade secret claim, and a claim fails as a matter of law without a cognizable theory of proximately caused damages." *W.L. Gore & Assocs. v. GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 888 (D. Ariz. 2012) (citation modified).

While Plaintiffs demonstrate a likelihood of success on their claim that Mr. Brosa misappropriated the Business Documents and EVC Emails, evidence of harm or threatened harm is severely lacking. On this point, the parties sharply contest whether Apex is a true competitor of Plaintiffs. During her cross-examination, Ms. Susi discussed two broad categories of services: general contracting services and stand-alone project management services. (Hr'g Tr. at 31:3–33:4.) The difference between these services is "an added layer

---

2021); *see also S.F. Veteran Police Officers Ass'n v. City & Cty. of S.F.*, 18 F. Supp. 3d 997, 1006 (N.D. Cal. 2014) ("[A] motion for a preliminary injunction must be supported by evidence that goes beyond the unverified allegations of the pleadings . . .").

of management between the owner and the general contractor." (Hr'g Tr. at 32:19–22.) Plaintiffs provide that added layer of management as a "third-party independent provider" (*id*. at 32:8–18), whereas Apex primarily acts as a general contractor that manages and performs the work itself (*id*. at 33:2–4). The distinction is insignificant for the purposes of this analysis. At the core of both parties' services is project management, and that is one of the several commodities both parties sell to multi-site customers. In this sense, Apex competes with Plaintiffs.

Though the two companies compete to provide project management services, the harm of Mr. Brosa's misappropriation is highly speculative. Plaintiffs offer no evidence that the misappropriation negatively affected them, such as a downward trend in customer generation, loss of revenue, or loss of market share. Even where Plaintiffs offer testimony that Apex submitted responses to the same three RFPs as them, there is no suggestion that they lost those business opportunities or suffered other harm as a result. Rather, Plaintiffs' theory of harm arises from the threat of it. But the evidence demonstrates that the Business Documents existed nowhere else but on the External Drive that Mr. Brosa has not accessed since July 2025.[4] To the extent that the EVC Emails are still in Mr. Brosa's possession, they pertain to an industry that Apex takes no part in. (*Id*. at 106:12–107:11.) Having failed to establish harm or threat of harm, Plaintiffs fail to demonstrate a likelihood that they will succeed on the merits of their trade secret misappropriation claim against Mr. Brosa.

### 2.    *Breach of Contract*

Plaintiffs argue that Mr. Brosa and Mr. Tankersley breached the confidentiality covenants contained in their respective Agreements. To establish a breach of contract claim, a plaintiff must show (1) a contract, (2) breach, and (3) damages. *Thunderbird Metallurgical, Inc. v. Ariz. Testing Lab.*, 423 P.2d 124, 126 (Ariz. 1967). Plaintiffs introduce the Brosa and Tankersley Agreements into evidence and sufficiently establish the first element. (*See* Docs. 17-8, 17-9.)

---

[4] The Court again observes that Plaintiffs make new allegations in their First Amended Complaint that Mr. Brosa copied other documents to a device while he was still in possession of it (*see, e.g.*, FAC ¶¶ 97–104), but unverified allegations are insufficient to justify the extraordinary award of injunctive relief. *See* footnote 3, *supra* at 13.

a.    Breach

While the parties originally briefed Plaintiffs' breach of contract claims related to the non-solicitation, non-recruitment, and non-compete covenants contained in the Brosa Agreement, Plaintiffs conceded at the hearing that they no longer seek injunctive relief as to those covenants. (Hr'g Tr. at 18:4–6, 130:11–132:7.) Accordingly, the Court will only address the likelihood of success on the merits of Plaintiffs' claims relating to the confidentiality covenants in both Agreements.

The confidentiality covenants prohibit Mr. Brosa and Mr. Tankersley from using or disclosing Plaintiffs' confidential information and mandate them to return it and other company property to Plaintiffs upon termination. (Doc. 17-8 at 2–3; Doc. 17-9 at 2–3.) Based on the content of the Business Documents and EVC Emails, they likely fall within the Brosa Agreement's definition of confidential information that includes "all documents or information, in whatever form or medium, regarding the business or affairs of the Company." (Doc. 17-8 at 2.) Mr. Brosa testified that he understood that the confidentiality covenant prohibited him from taking confidential information and from retaining Plaintiffs' property, such as the work laptop, but he retained the information and property anyway after his termination date. (Hr'g Tr. at 62:1–64:4.) His retention of the work laptop, External Drive that contained at least some confidential information, and the EVC Emails without Plaintiffs' permission is a clear-cut breach of the Brosa Agreement.

Plaintiffs' other theory of breach—that Mr. Brosa used or disclosed confidential information (Mot. at 13; Reply at 7–8)—is not so clear-cut. Plaintiffs cite one case for the proposition that they need only show that Mr. Brosa "accessed and removed confidential materials around the time of [his] departure" to demonstrate that he used or disclosed information in breach of the confidentiality covenant. (*See* Mot. at 13.) In *Colwell Consulting LLC v. Papageorge*, the former employee entered a confidentiality agreement that prohibited him from using the employer's "proprietary information" to his benefit. No. 2:24-cv-01824-JCG, 2024 LX 208401, at *18–19 (D. Ariz. Aug. 14, 2024). The employee downloaded numerous documents shortly before he terminated his employment. *Id*. at *8.

This case is distinguishable upon one critical fact: the employee started his own company in the same industry immediately after his termination. It was from this very fact that the court could "discern no other logical reason for these business files to have been accessed and transferred . . . other than for [his] use in a new competing business." *Id*. at *21.

Here, Mr. Brosa left his employment to join a company that was already established in its industry. Apex avers that it had "its own business strategies, processes, marketing plans and way of doing business that it has developed since it began doing full-scale general contractor rollouts nearly 40 years ago." (Cardona Decl. ¶ 16.) Mr. Brosa also presents several explanations for why he copied or forwarded himself confidential information, none of which are completely devoid of reason or as "fantastical" as Plaintiffs urge.[5] Based on the evidence in the record, it cannot be said that the *only* logical inference that can be made from Mr. Brosa's acquisition of Plaintiffs' information is to use or disclose it. Plaintiffs otherwise advance no other evidence aside from speculation that Mr. Brosa used or disclosed information protected by the confidentiality covenant.

As for Mr. Tankersley's breach, Plaintiffs assert that he "is believed to have violated his confidentiality covenant by duplicating BVTA's confidential computer information for Apex." (Mot. at 13.) As discussed *supra*, Plaintiffs offer nothing more than speculation that Mr. Tankersley has "duplicated" anything for Apex. In this State and Circuit, the inference that Mr. Tankersley will inevitably use his knowledge based solely on him working for Apex is impermissible. Plaintiffs fail to establish a likelihood of success on the merits of breach as to Mr. Tankersley.

b.    Damages

Now, having established the scope of breach shown by Plaintiffs, the Court turns to whether the damages element has been satisfied. Neither party addressed this element at all in their briefing or oral argument. The Court is weary to do so further. Rather, it merely

---

[5] The Court agrees with Plaintiffs that Mr. Brosa's explanations varied over time and that those explanations may ultimately be self-serving. However, the Court observes that his explanations—helping the incoming team after the transition, fearing his jump in employment would fall through, wanting to secure his personal files—can all be true no matter how misguided they may have been.

observes the plain language of the Brosa Agreement that asserts "the unauthorized use or disclosure of [confidential information] will cause irreparable harm, substantial injury, and loss of profits and goodwill" and "that a breach of Employee's obligations hereunder will result in irreparable and continuing damage to the Company, for which money damages may not provide adequate relief." (Doc. 17-8 at 2, 6.) But these clauses do not relieve Plaintiffs from their burden of setting forth evidence of damages, which is an essential element of their breach of contract claim. *See Graham v. Asbury*, 540 P.2d 656, 657 (Ariz. 1975); *see also Thomas v. Montelucia Villas, Ltd. Liab. Co.*, 302 P.3d 617, 621, 621 (Ariz. 2013) (holding that a party must prove it sustained actual damages from breach of a contract that contained a liquidated damage provision). Having presented no such evidence, Plaintiffs fail to show a likelihood of success on their claim that Mr. Brosa's breach of the confidentiality covenant caused them damages.

### C.    Irreparable Harm

Plaintiffs repeatedly argue that, at a minimum, they raise serious questions regarding the merits of their misappropriation and contract breach claims. (Mot. at 12, 15.) If true, then the Court would apply the Ninth Circuit's sliding scale approach in which a strong showing of hardship to the movant may rebalance a weak showing of the merits, but this assumes that "the other two elements of the *Winter* test are also met." *Jewell*, 747 F.3d at 1078 (citation modified). The Court now addresses the second *Winter* element to resolve any doubt that a preliminary injunction is not warranted here.

The Supreme Court has repeatedly recognized the "basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger v. Harris*, 401 U.S. 37, 43–44 (1971). In other words, irreparable harm is one that cannot be remedied by monetary damages. *Cutera*, 444 F. Supp. 3d at 1208.

Even where the injury is irreparable, the movant "must still rely on evidence to establish this type of irreparable harm, not mere speculation of such harm." *Luminate Home Loans, Inc. v. Better Mortg. Co.*, No. 24-cv-02251-BAS-MSB, 2025 U.S. Dist. LEXIS

22733, *13-14, at *13-14 (S.D. Cal. Feb. 7, 2025). "[C]onclusory statements and theoretical arguments are insufficient to meet the standard." *Medcursor Inc.*, 543 F. Supp. 3d at 877. While "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm," *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001), evidence of an economic injury alone is insufficient. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Plaintiffs assert three irreparable harms: (1) loss of confidential and trade secret information; (2) loss of customer goodwill; and (3) loss of competitive advantages. (Mot. at 15.) The case law of this Circuit is clear that these harms may be irreparable in some circumstances. *See id.*; *Fujikura Composite Am., Inc. v. Dee*, No. 24-CV-782 JLS (MSB), 2024 U.S. Dist. LEXIS 115959, at *15 (S.D. Cal. June 28, 2024) (collecting cases).

That harm, though, must be forthcoming and likely, not just possible, absent injunctive relief. *Garcia*, 786 F.3d at 740; *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Plaintiffs argue that irreparable harm is likely because Defendants misappropriated the trade secret information and Mr. Brosa and Mr. Tankersley each agreed that a breach of their agreements would result in irreparable harm to Plaintiffs. (Mot. at 15; *see also* Reply at 10.) Not so.

The Court has already detailed the ways in which Plaintiffs failed to show that Mr. Tankersley or Apex misappropriated or threatened to misappropriate ProTrack. And while there is evidence showing that Mr. Brosa acquired the Business Documents, there is no evidence that Mr. Brosa still possesses them after returning the External Drive such that he could use or disclose them. *See Sitrus Tech. Corp. v. Quynh Le*, 600 F. Supp. 3d 1106, 1111 (C.D. Cal. 2022) (declining to find irreparable harm where, based on the forensic evidence, "neither Plaintiff nor the Court can determine whether Defendant did transfer or copy files onto other devices he is still withholding"). To the extent Mr. Brosa retains access to the External Emails—which Plaintiffs did not establish but Defendants did not contest (*see* Hr'g Tr. at 127:24–129:16)—the evidence demonstrates that Apex is

"strategically not" in the EVC industry (*id*. at 107:5–6). This suggests that neither Apex nor Mr. Brosa could use that information to harm Plaintiffs' competitive advantage or goodwill built in that industry and among those customers.

Based on the record, the Court cannot find that irreparable harm is likely to occur based on Defendants' misappropriation of trade secrets. The case law cited by Plaintiffs counsels no differently. In *Nye*, a company's employee downloaded twenty-two company reports that included unique client and project data. 2024 U.S. Dist. LEXIS 25575, at *2–3. Once he began working for a competing business, the employee's access to the other reports was revoked. *Id*. at *3–5. The company lost three clients after the employee's departure but otherwise grew in both its customer base and revenue. *Id*. The court found irreparable harm existed due to the immediate risk that the employee would continue to use or disclose the twenty-two reports he downloaded and still retained. *Id*. at *19. But there was no immediate risk that the company would suffer loss of goodwill and reputation "given [the company's] healthy financial state and breadth of customers." *Id*. at *19–20. Here, Plaintiffs present no evidence that Mr. Brosa continues to possess the Business Documents, or that the EVC Emails that may be in his possession risk Plaintiffs' goodwill or reputation in the EVC industry.

In *Tribal Behavioral Health LLC v. Reeves*, the court determined that an emerging company was likely to be irreparably harmed when its consultant refused to turn over the company's client list and a confidential report that the company paid for to secure a specific business deal. No. CV-22-00926-PHX-SPL, 2022 U.S. Dist. LEXIS 112186, at *32–35, 37–38 (D. Ariz. June 24, 2022). The company was able to show that, as a new entrant in a highly niche industry without a book of business, the consultant's ongoing possession of those documents and continued work in that industry threatened the competitive advantage it obtained by compiling the customer list and paying for the report. *Id*. at *38. Here, Plaintiffs are neither emerging nor niche. As Plaintiffs themselves pronounce, they are a long-time "leader" in providing numerous technical services to "large, national or multinational companies" (Susi Decl. ¶¶ 8–10), so the Court is not convinced that the EVC

1    Emails, assuming they are in Mr. Brosa's possession, are the proverbial key to Plaintiffs'

2    success as the confidential report was to the emerging company in *Reeves* to support a

3    claim for loss of competitive advantage.

4        In *Papageorge*, a company demonstrated that its clients were requesting that their

5    files be transferred to its former employee who absconded with business information and

6    started a new competing company. 2024 U.S. Dist. LEXIS 144503 at *26. The court

7    determined that evidence of actual loss of clients was sufficient to demonstrate a threatened

8    loss of goodwill with those clients and irreparably harmed the company. *Id*. Here, Plaintiffs

9    set forth no evidence of client or revenue loss to support a claim for loss of goodwill.

10       These cases demonstrate that, while the acts underlying a misappropriation may

11   ultimately be relevant to an analysis of irreparable harm, Plaintiffs still must "demonstrate

12   immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean*

13   *Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

14       The fact that Mr. Brosa and Tankersley agreed that their breach of the Agreements

15   would cause irreparable injury does not change this outcome. It is well-established that "[a]

16   preliminary injunction is an extraordinary remedy never awarded as of right," *Winter*, 555

17   U.S. at 24. In light of this precedent, the Court is not convinced that contracting parties can

18   obviate an independent judicial determination of irreparable harm. Courts in other circuits

19   have reached the same conclusion. *See, e.g.*, *Flex-Plan Servs. v. Evolution1, Inc.*, No. C13-

20   1986-JCC, 2013 U.S. Dist. LEXIS 201868, at *22 (W.D. Wash. Dec. 31, 2013) (noting

21   similar a contractual provision and making an independent determination that irreparable

22   harm will occur); *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1261 (S.D. Fla. 2025)

23   (holding that a similar contractual provision "does not bind the Court's analysis as to

24   whether Plaintiffs have satisfied their burden of showing irreparable harm"); *Hodnett v.*

25   *Medalist Partners Opportunity Master Fund II-A, L.P.*, No. 1:21-cv-00038-MKV, 2021

26   LX 43518, at *20 (S.D.N.Y. Feb. 12, 2021) (collecting Second Circuit cases holding that

27   such contractual provisions are not dispositive in proving irreparable harm). Plaintiffs offer

28   no authority to persuade the Court otherwise.

1   While the Court may look to the Agreements to support a finding of irreparable

2   harm, that contractual language does not supplant the lack of evidence in the record that

3   irreparable harm will ensue absent injunctive relief. At most, Plaintiffs speculate that they

4   will be injured. But "[s]peculative injury does not constitute irreparable injury sufficient to

5   warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844

6   F.2d 668, 674 (9th Cir. 1988). As a result, Plaintiffs do not satisfy the second *Winter*

7   element.

8   **IV.    CONCLUSION**

9   Injunctive relief is an extraordinary remedy not granted lightly. *Starbucks Corp. v.*

10  *McKinney*, 602 U.S. 339, 346 (2024). Here, Plaintiffs fail to meet the first two *Winter*

11  elements and are not entitled to injunctive relief.

12  **IT IS ORDERED** denying Plaintiffs' Motion for Preliminary Injunction (Doc. 17).

13  Dated this 18th day of February, 2026.

14

15  Honorable John J. Tuchi
    United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28